IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

---

| | | |
|---|---|---|
| James D. Hamberlin, *et al.*, | : | |
| Plaintiffs, | : | No. CV-18-03624-PHX-DLR |
| vs. | : | |
| State of Arizona, *et al.*, | : | Report of Kenneth R. Wallentine |
| Defendants. | : | |

---

The following report of Kenneth R. Wallentine is submitted after reviewing the following documents, pleadings, records, and reports:

Plaintiffs' Complaint

Arizona Game and Fish Department report no. 17-003507

Defendants' Initial Mandatory Discovery Responses

Affidavit of Probable Cause in Support of Search Warrant incident no. 17-003507

State of Arizona Appellate Brief & Appendix case no. 1 CA-CV 18-0435

Plaintiffs' Motion to Controvert Search Warrant no. 2017-011592 & exhibits

Superior Court Order on Motion to Controvert Search Warrant no. 2017-011592

Pinal County Justice Court Complaint

Deposition transcripts, with exhibits, of Tim Holt and Kriselle Colvin

Order on Motion for Summary Judgment

Witness statements of Bobby Beeman, Dean Harris, Ervin Earl, and Kristen Harris

ST-HAMBERLIN012547

Kenneth R. Wallentine states as follows:

1.     In the instant matter, I have relied upon the documents, pleadings, records, reports, and statements previously described.  I have formed a number of opinions based upon the aforementioned, as well as my experience, education and familiarity with professional standards, practices and publications.  I have relied on a variety of professional publications, including, but not limited to, my own publications and court decisions cited therein.  I have considered various statements and accounts that may be in conflict one with another and considered factors such as the time at which the statement was made, the interests of the party making the statement, the vantage and view opportunities and perceptive abilities and consistency or inconsistency with the physical evidence, and evidence of any possible impaired cognition and the collective statements of other witnesses.  My opinions, and a summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows.

**Abbreviated synopsis of reported events:**

On September 6, 2017, Kristen Harris called the Arizona Game and Fish Department's Operation Game Thief hotline to report that she and her husband, Dean Harris, had witnessed a powered parachute flying near the Quarter Circle U Ranch in the foothills of the Superstition Mountains in Pinal County, Arizona.  Dean Harris worked as the ranch manager for the Quarter Circle U Ranch owner.  Harris said that they had seen the powered parachute flying near the ranch sometime in August and again on September 2 and 4, 2017.

Arizona Game and Fish Department Officer Kriselle Colvin began to investigate the hotline tip.  Officer Colvin is a law enforcement officer and wildlife manager.  Officer Colvin is a wildlife biologist with extensive experience in managing bighorn sheep.  She was also very familiar with the area where Ms. Harris reported seeing the powered parachute.  Officer Colvin knew Dean and Kristen Harris and considered them to be reliable.  Ms. Harris reported that the aircraft was flying around areas frequented by bighorn sheep, and that it was flying along terrain and in a pattern consistent with attempting to locate bighorn sheep.

Officer Colvin was familiar with the herd of bighorn sheep in the area and knew that the area was part of a designated big game hunting management unit. Officer Colvin began investigating possible violations of Arizona wildlife laws and Arizona Game and Fish Department administrative rules. Officer Colvin focused on potential violations of Arizona Administrative Code R12-4-319, which prohibits use of any aircraft to locate wildlife within 48 hours prior to or during an open big game hunt season, and Arizona Administrative Code R12-4-320, which prohibits harassing wildlife with an aircraft at any time. Officer Colvin knew that there was an open big game hunt (archery deer) season open in the area during that time.

The Harrises related to Officer Colvin that approximately a month earlier, Tim Downs, a hunting guide known to them, had asked Dean Harris for permission to fly over the Quarter Circle U ranch to locate bighorn sheep in connection with guiding for the successful bidder for bighorn sheep auction. Dean Harris declined to allow permission for Downs to overfly. The Harrises told Officer Colvin that they believed the aircraft was possibly piloted by Shane Koury, another hunting guide known to them.

Officer Colvin learned that Downs had previously worked cooperatively with Shane Koury in an arrangement known as "sub-guiding." Officer Colvin also identified Shane Rhoton as the owner of the bighorn sheep auction tag. She learned that Rhoton had asked the Arizona Game and Fish Department to deliver his tag to Downs. Officer Colvin spoke with two other witnesses, Bobby Beeman and Ervin Earl, who told her that they saw a two-seat powered parachute aircraft with a yellow and orange parachute, as they were hiking in the Superstition mountains wilderness area on September 4, 2017. They reported that the aircraft was occupied by two persons and that one had a large camera with a long lens. The witnesses were unable to identify the two flyers. Officer Colvin also learned that plaintiff owned a two-seat powered parachute aircraft with a yellow and orange parachute.

Learning that Downs and his fellow guide Bob Kyhn had some association with James Hamberlin ("plaintiff"), Officer Colvin viewed Downs' and plaintiff's social media pages, seeing hundreds of photographs of bighorn sheep on each of their respective social media sites. Officer

ST-HAMBERLIN012549

Colvin noted that many of the images of bighorn sheep on both sites had a copyright watermark bearing plaintiff's name.  She opined that many of the images showed terrain consistent with game management unit the encompasses the Quarter Circle U ranch (identified as "GMU 24B" in the Superstition Wilderness area).  Several images of bighorn sheep posted on plaintiff's Facebook page appeared to have been taken from an aerial vantage point and bore posting dates of August 22 and 28, and September 1 and 5, 2017, respectively.  Arizona Game and Fish Department Captain Tim Holt shared an aerial photograph of bighorn sheep that bore plaintiff's copyright watermark.  That photograph featured a group of bighorn sheep clustered together and looking upward, presumably directly at the lens of the camera capturing the image.  Officer Colvin described the bighorn sheep as gathered in a defensive grouping consistent with the behavior of bighorn sheep when confronted with a predator above them.  She based her conclusion on her training as a wildlife manager and her experience as a wildlife biologist engaged in aerial surveys of bighorn sheep populations and seeing first-hand the bighorn sheep's reaction to an aircraft overhead.  Officer Colvin opined that an aircraft prompting the sheep's defensive behavior constitutes harassment of the bighorn sheep.

Officer Colvin obtained search warrants for Koury's, Downs' and plaintiff's mobile phone records.  Officer Colvin dismissed Koury from consideration as the aircraft pilot reported by the Harrises because his mobile phone records reflected that he was not near the GMU 24B area on either September 2 or 4, 2017.  Officer Colvin also confirmed that Rhoton had hired Downs as his hunting guide for his bighorn sheep auction tag hunt, and not Koury.  Contrariwise, Downs' and plaintiff's mobile phone records suggested that they were frequently communicating with each other during this period.  Their phones communicated with one another on the mornings of September 2 and 4, 2017.  The mobile phone records also placed Downs' phone in the Superstition Wilderness on September 2, and located plaintiff's phone in the same area on September 2 and 4, 2017.

On October 27, 2017, Officer Colvin was patrolling in GMU 24B.  It was the first day of a deer hunt in that game management unit.  She saw a powered parachute aircraft, with a yellow

ST-HAMBERLIN012550

and orange canopy and two occupants, fly south out of GMU 24B.  She saw the aircraft land in a flat zone at Desert Wells.  Plaintiff was piloting the aircraft.  Officer Colvin approached plaintiff and spoke with him.  Plaintiff told Officer Colvin that he does not directly provide wildlife photographs to hunting guides, contradicting a long history of sending images of the bighorn sheep known as "Elvis" and other bighorn sheep to Downs and Kyhn.  Kyhn had asked plaintiff to not share the images with others because he wanted Elvis to be the target of Rhoton's hunt.

Without any apparent prompting and not in response to a question, plaintiff volunteered that he was glad to be flying because he had not flown his aircraft since early August 2017.  Plaintiff's claim contradicted the statement of Mike Barm, who flew as plaintiff's passenger on September 4.  Plaintiff's statement was also inconsistent with mobile phone records that placed his phone in the area of GMU 24B on September 4.  Those phone records showed plaintiff's phone moving from cell tower to cell tower in what appeared to be a flight path.  Plaintiff also said that he knew that flying to locate animals during an open hunt season was prohibited.

On November 21, 2017, Officer Colvin submitted an affidavit in support of a search warrant.  The affidavit described her investigation, including much of the information recited above.  Officer Colvin's affidavit included the Harrises' suspicion that Koury was flying the aircraft that they saw over the Quarter Circle U ranch in August and on September 2 and 4.  However, while Officer Colvin identified plaintiff as the pilot, she did not specify how she eliminated Koury from suspicion.  Prior to submitting the affidavit to a Superior Court judge, Officer Colvin had the affidavit reviewed by several command level officers of the Arizona Game and Fish Department.  Others reviewing the affidavit included her immediate supervisor, Tim Holt, the law enforcement branch supervisor, Ken Dunkel, the chief of the law enforcement branch, Gene Elms, and Officer Colvin's direct supervisor, Jay Cook, the Mesa regional supervisor.  The assistant director of field operations, Tom Finley, was briefed on the affidavit and the investigation progress.

A judge reviewed the affidavit, spoke with Officer Colvin, and issued search warrants for plaintiff's residence, vehicles and social media account.  The warrant directed seizure of certain

ST-HAMBERLIN012551

documents, images, recording devices such as cameras and associated paraphernalia, global positioning satellite devices, aircraft, mobile phones, computers, digital storage devices, etc. On November 21, 2017, a number of Arizona Game and Fish Department officers served a search warrant at plaintiff's residence at 5455 East Garnet Avenue, Mesa, Arizona. Officers also served a search warrant at Downs' residence at the same time.

On June 25, 2018, plaintiff petitioned the Superior Court to controvert the search warrant served at his residence. Though plaintiff's seized property had been returned to him, plaintiff sought for the return of copies of digital data. The court ruled that plaintiff was entitled to the copies made of his digital data. The court found that Officer Colvin "was engaged in a reasonable investigation" and "found nothing improper in her suspicion." Even so, the court cited the inclusion on the Harrises' erroneous suspicion of Koury and the court disagreed with the magistrate's determination of probable cause.

**Discussion and opinions:**

A.   **Officer Colvin's investigation and decision to request a search warrant for evidence located at plaintiff's residence was consistent with generally accepted police policies, practices and training.**

   1.   Of the innumerable affidavits in support of search warrants reviewed by Arizona magistrates each year, the affidavit in this case is somewhat atypical in two respects–the level of offense under investigation and the breadth and depth of investigation and pre-judicial assessment and review of the investigation.

   2.   Plaintiff's pleadings emphasize that the crimes of which plaintiff was accused are categorized as Class 2 misdemeanors under Arizona law. Plaintiff intimates that he considers his crimes to be *de minimis* in nature, citing the relatively short period of incarceration and the comparably affordable fine associated with this degree of offense. Officers are trained to seek search warrants to obtain evidence not otherwise accessible in the course of an investigation. Officers are not taught

ST-HAMBERLIN012552

to weigh the potential penalty as a factor in determining whether or not to seek a search warrant.  Though there may be individual cases and particular officers who consider the possible outcome of successful prosecution in determining whether to follow the necessary steps to seek a search warrant, valuation of the potential penalty is simply not taught to officers as a cost/benefit step in the warrant process.  To the contrary, police training in the past decade or two has increasingly focused on the use of search warrants in misdemeanor cases.  In many states, including Arizona, courts and legislatures have introduced changes to the respective states' search warrant procedures to facilitate obtaining search warrants in the investigation of misdemeanor offenses.

3.    The majority of offenses investigated by Arizona Game and Fish Department officers are classified as misdemeanors by the Arizona state legislature.  For example, Arizona Game and Fish Department officers are responsible for enforcement of misdemeanor laws addressing operating water craft and off-highway vehicles while under the influence of alcohol or drugs.  This is similar to the charge for municipal, county and state officers to enforce driving under the influence misdemeanor offenses on roadways.  Even though impaired drivers kill at least one person every hour of every day of every year, operating a boat, off-highway vehicle or motor vehicle are misdemeanor crimes in the state of Arizona. Virtually all of the Arizona big game offenses are classified as misdemeanors. Arizona Game and Fish Department officers are trained to pursue investigations of all violations and to consider big game regulation violations as "serious" offenses.  If one measures the potential financial impact of a single big game animal harvested, for example, just one of the bighorn sheep addressed in this case cost a minimum of a quarter-million dollars to harvest.  Even casual hunters know that Arizona big game auction tags often sell for hundreds of thousands of dollars for the tag alone, not inclusive of substantial peripheral costs.

ST-HAMBERLIN012553

4.      In most state and local law enforcement agencies, the majority of search warrants obtained are connected to drug trafficking and the targets of the search warrants are often residences.  In the course of drafting an affidavit in support of a search warrant in a typical case, the case officer generally prepares the affidavit, and often the warrant itself, as a solo endeavor.  Fairly often, the case officer will submit the completed affidavit to a colleague or supervisor for quality control.  In some jurisdictions, a prosecutor or police department legal counsel may review the affidavit prior to filing.

5.      Officer Colvin submitted the November 21, 2017, affidavit in support of a search warrant to multiple levels of review by experienced and senior command staff members.  Whether motivated by department practice or by recognition of the possible high profile of the investigation, this action–though laudable, but not statutorily or constitutionally mandated–helped ensure that the affidavit met the probable cause standard as taught to reasonable and well-trained officers.  Senior command staff members reviewing the affidavit included law enforcement branch supervisor Ken Dunkel, Chief Gene Elms, as well as Officer Colvin's regional supervisor, Jay Cook.  Assistant Director Tom Finley was also briefed on the affidavit and the investigation progress prior to seeking the warrant.

6.      In the course of my career, I have drafted or reviewed many hundreds of affidavits in support of search warrants in a variety of types of investigations prepared by officers representing the full range of state, local and federal law enforcement agencies, for evidence ranging from dinosaur bones, human tissue found in African lion scat, caches of hundreds of thousands of illegal images, exotic wildlife, large and small quantities of illegal drugs, electronic data, blood and other body fluids, automotive components, aircraft G.P.S. logs, and many other varied types of evidence.  In my experience, I have observed that wildlife resource officers uniformly prepare some of the most carefully and logically drafted

affidavits.  In the course of teaching and lecturing, I have often held up wildlife resource investigators as examples of investigators who exhibit great thoroughness and detailed accuracy in their investigations and reporting.  I have heard prosecutors from other offices, as well as trial judges, make similar observations.  In my opinion, the affidavit in this case is consistent with those observations.

8.    In my experience, I have noted three general explanations for the consistent excellence in investigation and affidavit preparation by wildlife resource officers.  Each explanation is evident in this case.  First, commendably, but unlike many law enforcement officers, wildlife resource officers generally have significant formal education.  Most hold baccalaureate degrees in rigorous science disciplines.  Officer Colvin holds a degree in conservation biology from Arizona State University, a school known nationally and widely acclaimed for its science programs.  Moreover, Officer Colvin is recognized as well-trained by virtue of possessing an Arizona Peace Officer Standards and Training Field Training Officer and General Instructor certifications.  Second, wildlife resource officers generally pursue their education with a passion to be employed in the field of conservation and wildlife management.  Nearly all of the wildlife resource officers with whom I have closely worked (and particularly during my tenure in an area frequented by world-class big game hunters) began their college education with the terminal goal of working for a state or federal conservation agency.  Officer Colvin testified that she pursued a degree in conservation biology with the aim of working with the Arizona Game and Fish Department.  Third, it has been my experience that wildlife resource officers conduct their investigations in a highly collaborative manner; they share their questions and findings with their professional colleagues and solicit and welcome collaboration.  Often, wildlife conservation officers will be acquainted with landowners, ranchers and natural

resource managers in their assigned areas.  They often model community policing practice at its theoretical best, though not in an urban environment.  Moreover, they generally consult with experienced supervisors.  Each of these elements is evident in Officer Colvin's investigation of this case.

9.      Officers are taught in basic academy training that probable cause is a flexible standard and that it is impossible to precisely define in the context of any single case.  They are taught that probable cause is clearly more than mere conjecture or bare suspicion, but far less than proof beyond a reasonable doubt.  Officers are commonly instructed with this citation from the United States Supreme Court, excerpted from a police training manual:

> "Probable cause is a fluid concept–turning on the assessment of probabilities in particular factual contexts–not readily, or even usefully, reduced to some neat set of legal rules."  "Probable cause is a flexible, common-sense standard.  It merely requires that the facts available to the officer would warrant a man of reasonable caution [to believe] that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such belief be correct or more likely true than false."

10.     At the time that Officer Colvin presented the affidavit in support of a search warrant to supervisory and command officers for review and to the court for consideration of issuance of a search warrant, she knew and/or reasonably believed the following:

a.      Officer Colvin was familiar with Arizona wildlife laws and Arizona Game and Fish Department administrative rules related to use of aircraft to locate or harass wildlife.  Officer Colvin knew that there was an open big game hunt season open in the GMU 24B area during the time that a powered parachute was seen flying in the area.

b.      On September 6, 2017, Kristen Harris and Dean Harris had seen a powered parachute flying near the Quarter Circle U Ranch sometime in August and again on September 2 and 4, 2017.  They reported seeing the aircraft was flying around areas frequented by bighorn sheep, and that it was flying along terrain and in a pattern consistent with attempting to locate bighorn sheep.  Kristen Harris had seen other "paraplanes or ultra-things–whatever they call them" flying above the ranch in patterns inconsistent with searching for big game.  Though they suspected Koury might be flying the aircraft, the Harrises were not able to visibly identify the person in the aircraft.  Officer Colvin knew Dean and Kristen Harris and considered them to be reliable.  That report prompted the investigation that lead to the affidavit in support of a search warrant at plaintiff's residence.  Officer Colvin later learned that the Harrises' suspicion that Koury was flying the aircraft was mistaken.

c.      Officer Colvin learned from Bob Beeman and Ervin Earl that they saw a two-seat powered parachute aircraft with a yellow and orange parachute in the Superstition mountains wilderness area on September 4, 2017.  They told Officer Colvin that the aircraft was occupied by two persons and that one had a large camera with a long lens.  Beeman believed that the persons in the powered parachute were searching for wildlife.  He based his opinion on his "knowledge as a hunter and knowing where the wildlife, where the sheep hang out, where they flew and how they flew."  Earl also opined that the flyers were looking for wildlife, "based on my assumption and my experience as a hunter, we all know where the sheep hang out and where the sheep live, which is on the edge of the cliffs on the tops of the mountains."  Beeman also reported seeing what he believed to be the same

ST-HAMBERLIN012557

aircraft flying in the same area and in a similar fashion on November 14, 2017.

d.   Officer Colvin confirmed that plaintiff owned a two-seat powered

parachute aircraft with a yellow and orange parachute.

e.   Captain Holt showed Officer Colvin an aerial photograph of bighorn sheep

that bore plaintiff's copyright watermark.  The photograph featured a group

of bighorn sheep clustered together and looking upward.  Officer Colvin

opined from photo that an aircraft was prompting the bighorn sheep's

defensive behavior and that act constituted harassment of the bighorn

sheep.

f.   Officer Colvin viewed plaintiff's Facebook and Instagram pages and saw

hundreds of photographs of bighorn sheep.  Officer Colvin noted that

many of the images of bighorn sheep had a copyright watermark bearing

plaintiff's name.  She opined that many of the images showed terrain

consistent with GMU 24B game management unit.  Several images

appeared to have been taken from an aerial vantage point and bore posting

dates of August 22 and 28, and September 1 and 5, 2017, respectively.

g.   Officer Colvin learned from Downs' and plaintiff's mobile phone records

that it was probable that they were frequently communicating with each

other during this period.  Their phones connected with one another on the

mornings of September 2 and 4, 2017.  The mobile phone records also

placed Downs' phone in the Superstition Wilderness on September 2, and

located plaintiff's phone in the same area on September 2 and 4, 2017.

h.   On October 27, 2017, Officer Colvin saw a powered parachute aircraft

with a yellow and orange canopy and two occupants fly south out of GMU

24B.  She saw the aircraft land in a flat zone at Desert Wells.  Plaintiff was

piloting the aircraft.  Plaintiff told Officer Colvin that he does not directly

provide wildlife photographs to hunting guides, contradicting a long

*Hamberlin v. State of Arizona*
*Report of Kenneth R. Wallentine*

ST-HAMBERLIN012558

history of sending images of the bighorn sheep known as Elvis and other bighorn sheep to Downs and Kyhn. Plaintiff told Officer Colvin that he was glad to be flying because he had not flown his aircraft since early August 2017. Officer Colvin learned that plaintiff's statement was inconsistent with the statement of Barm, who flew with plaintiff on September 4. Officer Colvin also learned that plaintiff's statement was also inconsistent with mobile phone records that placed his phone in the area of GMU 24B on September 4. Plaintiff also said that he knew that flying to locate animals during an open hunt season was prohibited.

i.   Officer Colvin knew that plaintiff was involved in Rhoton's hunt for Elvis, based in part on plaintiff proving a detailed narrative of the successful hunt. Plaintiff was in the group when Rhoton harvested Elvis, though he may not have been at the location when Elvis was shot with the arrow and then a bullet. Officer Colvin knew that plaintiff had been in the area on prior occasions when Rhoton sought to harvest Elvis. Officer Colvin saw numerous communications between plaintiff and Downs regarding when Rhoton was traveling from Alaska to Arizona, the logistics of Rhoton hunting for Elvis, and general discussions of Elvis's location. Officer Colvin also learned that plaintiff stored Elvis at his house at the conclusion of the hunt.

j.   Officer Colvin noted in her affidavit that plaintiff had taken hundreds of photographs of Elvis and that he bragged to her that he had discovered and named Elvis. She recounted that plaintiff showed her multiple pictures of Elvis on his cell phone. Officer Colvin stated that Downs reported that plaintiff was a "tag along guy" for Downs in the search for bighorn sheep. Officer Colvin reasonably believed that a search warrant would produce additional evidence that plaintiff assisted in the pursuit of Elvis.

11.    Based on the information known to and/or reasonably believed by Officer Colvin at the time of preparing the affidavit in support of a search warrant, a reasonable and well-trained officer would have believed that there was probable cause to support the issuance of a search warrant seeking evidence of violations of Arizona statutes and regulations related to wildlife.  A number of experienced command-level Arizona Game and Fish Department officials concurred.  Obviously, the Superior Court judge issuing the warrant also so concluded.

12.    The judge who granted plaintiff's motion to controvert the search warrant confirmed the reasonableness of Officer Colvin's investigation and the reasonable nature of her drafting error in not clarifying that her investigative efforts discounted the Harrises' identification of Koury as the pilot of the aircraft that they saw.  The substance of the Harrises' tip was accurate; the reported activity took place and reasonably appeared to be unlawful use of an aircraft in a game management unit area.  What was mistaken was their subjective belief about the identity of the offender.  A reasonable and well-trained officer, upon learning of the Harrises' error, would not believe that the mistaken identity affected the conclusion that the aircraft pilot was unlawfully harassing wildlife or scouting for bighorn sheep.  It wasn't the identity of the suspect that was at issue at that point in the investigation.  That the Harrises jumped to an incorrect conclusion of identity did not materially impact the investigation.  In fact, the thoroughness of Officer Colvin's investigation is what corrected their mistaken information and avoided the injustice of pursuing Koury.

13.    The omission of information clearing Koury as a possible suspect did not impact outcome of the investigation.  It was a minor, albeit understandable and reasonable, error.  Officer Colvin accurately reported the investigative developments that lead to identification of plaintiff as the involved party.

2.      In reaching my opinions in this matter I have relied upon my training and experience in public safety acquired throughout my career.  A summary of my qualifications, publications, litigation history and fee schedule are recited herein.

3.      **My qualifications as an expert in this subject matter include the following:**  I am a law enforcement officer in the State of Utah.  I became certified as a law enforcement officer in the State of Utah in 1982.  I am the Chief of the West Jordan (Utah) Police Department, where I oversee all police operations and investigations.  I am the Chair of the Governing Board of the Officer-Involved Critical Incident Investigations Teams in Salt Lake County, Utah.  I was formerly employed with the Utah Attorney General, where I served as the Chief of Law Enforcement.  After a period in private practice, I was as a Special Agent with the Utah Attorney General Investigation Division, where I coordinated a statewide use of force training initiative and coordinated officer-involved shooting investigations and other special investigations.  I also serve in a consultation role as Senior Legal Advisor for Lexipol, the nation's leading provider of law enforcement risk management resources.

I was formerly employed as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah.  I also supervised the police service dog training and certification program for the State of Utah.  I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety.

My duties included direct supervision and command of various investigative units and agents throughout the State of Utah, supervising law enforcement officers, forensic specialists, and technicians.  I commanded the State of Utah Child Abduction Response Team.  I commanded the State of Utah Officer-Involved Fatality Investigation Team.  I am a member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide

ST-HAMBERLIN012561

and complex violent person crimes investigations.  In 2010, Governor Herbert selected me for the Governor's Leadership in Public Service award for my work in public safety leadership.

4.      I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy.  I continue to teach at the Utah Law Enforcement Academy.  I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability.  I am a certified POST Firearms Instructor, and often served as the lead instructor for POST Firearms courses.  I am certified by the Force Science Research Center as a Force Science Analyst® and an Advanced Force Science Specialist®.  I am a former certified TASER® Instructor.  I am a certified Excited Delirium and Sudden Death Investigation Instructor.  I was certified by the Los Angeles Police Department in Officer-Involved Shooting Investigation.  In 2011, I was certified by the Institute for the Prevention of Sudden In-Custody Death as an instructor in restraint systems.

5.      I am a licensed attorney, having practiced law since 1990.  I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah.  I am a Master of the Bench of the American Inns of Court, Inn One, where I also serve as the past-President of the Inn of Court.  I occasionally serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities.  I was formerly on the faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies for Public Safety.

6.      In addition to my primary employment, I occasionally consult and provide expert witness opinions on police procedures, and use of force issues.  I occasionally perform in-custody death

investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise.  I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies.  I am the co-founder of a best practices advisory group that developed comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and various state law enforcement agencies.  These policies serve as a model for all Utah public safety agencies.  I am the author of a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies.  I have served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

7.      I participate and serve in a number of community and professional capacities. Professional activities pertinent to law enforcement include serving as a member of the Board of Directors of the Institute for the Prevention of Sudden In-Custody Death, former member of the Board of Directors of Crisis Intervention Team Utah, Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, member of the International Association of Law Enforcement Educators and Trainers Association, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, member of the International Association of Law Enforcement Firearms Instructors, member of the International Association of Directors of Law Enforcement Standards and Training, member of the International Law Enforcement Educators and Trainers Association, member of the K9 Section of the Utah Peace Officers Association, member of the United States Police Canine Association, past member of the board of directors of the NAACP, Salt Lake City branch, and board member and co-Chairman of the Utah Law Enforcement Legislative Committee.  I formerly served as a gubernatorial appointee to the

ST-HAMBERLIN012563

Council on Peace Officer Standards and Training.  I am a former member of the Scientific

Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices

organization sponsored by the Federal Bureau of Investigation, the Department of Homeland

Security, and the Transportation Security Administration, with support coordinated by the

International Forensic Research Institute at Florida International University.  I have been a

presenter at a variety of professional conferences and seminars, including presenting on use of

force training at the annual convention of the International Association of Chiefs of Police and

the International Conference of the Institute for the Prevention of Sudden In-Custody Death.

8.      From 1994 to 2014, I was a consultant with the K9 Academy for Law Enforcement and

the International Police Canine Conference.  My principal responsibilities included providing use

of force training, civil liability instruction, and search and seizure instruction.  I have provided

police service dog training and certification standards consultation for two police service dog

organizations, including a western regional group and one of the major national groups.  I serve

as a consultant for the California Narcotic and Explosive Canine Association and have been a

featured lecturer at their annual training conference over the past decade.

9.      I am a Senior Legal Advisor for Lexipol.  In that capacity, I have assisted in the drafting

and review of use of force and other policies in current use by more than 3,300 public safety

agencies in the United States.

10.     **My publications (limited to ten years) include the following:**  I have previously

published a number of other professional articles, many of which have been subjected to peer

review.  My most recent book, *Preparing for an Active Shooter Threat*, was published in July

2020 by Blue360 Media.  Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure

for Police, Prosecutors, and Defenders*, 2nd edition, was published in 2020 by the American Bar

Association Publishing Division.  It is a treatise on public safety and criminal procedure.  *The K9

Officer's Legal Handbook*, 3rd edition, was published in February 2019, by Blue360 Media.  My

other published works include:  *Mitigating Suicide Threat Response Risks*, Police Chief, V. 86,

No. 3 (2019);  *Avoiding a Peer Support Pitfall*, Police Chief, V. 85, No. 3 (2018); *Should I Stay or Should I Go?*, POLICE, October 2017, *Hill v. Miracle: Adapting the Graham Standard to Non-Criminal Interventions*, Police Chief (August 2017): 18–19; *Armstrong v. Village of Pinehurst: Training and Policy Implications for Police*, Police Chief, V. 83, No. 6 (2016); *Supreme Court Decision Casts Doubt on Hotel Registry Ordinances*, Police Chief, V. 81, No. 10 (2015); *Body Worn Cameras: Plan Before Your Office Buys In*, The Sheriff (June 2015); *Legal Risks of Failing to Care for Children of Arrested Persons*, Police Chief, V. 81, No. 10 (2014);  *A Rational Foundation for Use of Force Policy, Training and Assessment*, 2014 (2) AELE Mo. L. J. 101; *Post Incident Video Review*, Police Chief, V. 68, No. 12 (2011); *Cell Site Location Evidence: A New Frontier in Cyber-Investigation*, 2011 (2) AELE Mo. L. J. 501, *Prospects, Pitfalls and Pains of Social Media and Public Safety*, The Municipal Lawyer, September 2010; *Police Department May Read Text Messages Sent on Agency-issued Pagers: City of Ontario, California v. Quon*, Police Chief, V. 57, No. 8 (2010); *Collection of DNA Upon Arrest: Expanding Investigative Frontiers*, Police Chief, V. 57, No. 1 (2010); *Targeting TASER: The New TASER Aim Points,* Law Officer, January 2010.

11.     **My fee schedule is established as follows:** I charge $250.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony, with a minimum of $1,000.00 for deposition or court testimony.  I bill for actual travel expenses and a travel fee of $1,000.00 per day/part-day for travel to western states and $1,500.00 per day/part-day outside western states.

12.     **My prior experience as an expert witness (limited to the past four years) includes the following cases:**  I have been qualified as an expert in the subject matter of police procedures, including use of TASER® devices, police use of force, shootings and wrongful death claims, search and seizure, police service dog use, both in drug detection and dog bites, and I have never had a court decline to find that I am a qualified expert witness.  I have testified and/or provided depositions and trial testimony in the following cases which may be generally related to

ST-HAMBERLIN012565

the subject of the instant litigation in the past four years:  *Peralta v. Arizona Department of Public Safety*, No. CV-17-01868-DJH-BSB,  United States District Court for the District of Arizona, 2020.  Trial testimony given on behalf of defendant.  Subject matter: police custody. *Krakana & Zinn v. City of Scottsdale*, No. CV-17-01813-PHX-JJT,United States District Court for the District of Arizona, 2020.  Trial testimony given on behalf of defendant.  Subject matter: police tactical operation.  *Smith v. City of Waterloo*, Case No. LACV133172, District Court for Black Hawk County, Iowa, 2019.  Trial testimony given on behalf of defendants.  Subject matter: emergency vehicle operation.  *Mould v. City of Tempe*, No. CV2016-018161, United States District Court for the District of Arizona, 2019.  Trial and deposition testimony given on behalf of defendant.  Subject matter: wrongful death.  *Castro v. State of Arizona*, Case No. 2:18-cv-00753-SRB, United States District Court for the District of Arizona, 2019.  Deposition testimony given on behalf of defendants.  Subject matter: police use of force.  *Lawrence v. Las Vegas Metro Police Department*, No. 2:16-cv-03039-JCM-NJK, United States District Court for the District of Nevada, 2019,  Deposition testimony given on behalf of defendants.  Subject matter: wrongful death.  *Webb v. City of Waterloo*, No. 6:17-cv-2001-CJW-MAR, United States District Court for the Northern District of Iowa.  Deposition testimony given on behalf of defendants.  Subject matter: police use of force.  *Charboneneau v. Demings*, No. 2017-CA-010862-O, Ninth Judicial District Court, Orange County, Florida, 2019.  Hearing testimony given on behalf of defendants.  Subject matter: use of force.  *Carsons v. Black Bear Reserve Homeowners Association, Inc., et al.*, No. 35-2015-CA-001910, Fifth Judicial District Court, Lake County, Florida, 2018.  Deposition testimony given on behalf of defendants.  Subject matter: investigative procedures.  *McSwain v. United States*, No. 2:15-cv-01321, United States District Court for the District of Nevada, 2018.  Trial testimony given on behalf of defendant. Subject matter: negligence.  *Rodriguez v. City of West Covina*, No. 2:17-CV-0138 CBM, United States District Court for the Central District of California, 2018.  Deposition testimony given on behalf of defendant.  Subject matter: police canines.  *Mims v. City of Charlotte*, No.

2014-CVS-23815, Superior Court of North Carolina, 2018.  Trial and deposition testimony given on behalf of the defendants.  Subject matter: wrongful death.  *Chastang v. Levy*, No. 6:17-ev-00538-0r1-37 DCI, United States District Court for the Middle District of Florida, 2018. Deposition testimony given on behalf of defendant.  Subject matter: police defensive deadly force.  *Johnson v. Peay*, No. 160700949, Second District Court, State of Utah, 2017.  Trial testimony given on behalf of defendant.  Subject matter: police force to effect arrest.  *Brunette v. Burlington*, No. 2:15-cv-61, United States District Court for the District of Vermont, 2017. Deposition testimony given on behalf of defendant.  Subject matter: wrongful death.  *Landon v. City of North Port*, No. 8:15-cv-02272-CEH-JSS, United States District Court for the Middle District of Florida, 2017.  Deposition testimony given on behalf of defendant.  Subject matter: police force to effect arrest.  *Christiansen v. West Valley City, et al.*, No. 2:14-cv-00025, United States District Court for the District of Utah, 2016.  Trial testimony given on behalf of defendants.  Subject matter: police force to effect arrest.  *State v. Barney*, No. 161300117, Fourth District Court, State of Utah, 2016.  Trial testimony given on behalf of the prosecution.  Subject matter: use of force.  *United States v. Jereb*, No. 2:15-mj-00356, United States District Court for Utah, 2016.  Trial testimony given on behalf of the prosecution.  Subject matter: use of an electronic control device.  *Talley v. City of Charlotte*, No. No. 3:14 CV 683, United States District Court for the Western District of North Carolina, 2016.  Deposition testimony given on behalf of the defendants.  Subject matter: negligent custody.  *Gonzales v. Douglas*, No. CV-15-00064-PHX-NVW, United States District Court for the District of Arizona, 2016. Deposition testimony given on behalf of defendant.  Subject matter: police force to effect arrest. *McDonald v. Dupnik*, No. C20142895 Superior Court, State of Arizona, Pima County, 2016. Trial and deposition testimony given on behalf of defendants.  Subject matter: police force to effect arrest.

The observations and opinions stated herein are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the

ST-HAMBERLIN012567

litigation process.  They are based on the best information presently known to me.  I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with physical evidence, that were provided to me.  The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony, consideration of any report submitted by plaintiff's experts, further investigation and/or further witness interviews.  I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or diagrams, video and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents.

### Conclusion

Officer Colvin's investigation of plaintiff's activities was consistent with the actions of a reasonable and well-trained officer.  But for the minor error of omitting information clearing Koury, the affidavit in support of a search warrant was commendably thorough.  Based on the information contained in the affidavit, even knowing of the inconsequential elimination of an earlier suspect, a reasonable and well-trained officer would have concluded that there was probable cause to seek and obtain a search warrant.

Kenneth R. Wallentine
July 20, 2020

*Hamberlin v. State of Arizona*
*Report of Kenneth R. Wallentine*

ST-HAMBERLIN012568